RAWLS, Chief Judge.
Defendant Mrs. Polly Carnegie has appealed from an adverse judgment in an action charging that she fraudulently induced plaintiff United Farm Agency, a real estate broker, to accept a smaller commission than that agreed upon for the sale of her property. Pier major contention is that the evidence when considered in the light most favorable for the plaintiff appellee is legally insufficient to sustain the verdict and judgment. We agree.
Mrs. Carnegie, the sole owner of General Tung Oil Corporation at Lamont, Florida, desired to sell the corporation and agreed to having it listed with realtor Postell Hopkins, the Monticello, Florida, representative for United Farm Agency. The agreement then entered into allowed a net return to Mrs. Carnegie of $230,000, and United’s commission was to be in addition to that amount. Hopkins testified, "My understanding was that whatever I sold it for over $230,000 would be commission and it did include the entire plantation, with no exceptions * * * three dwellings and, I believe, six tenant houses * * * and some personal property * * He listed the Corporation at $250,000 and as including 2550 acres. On May 5, 1963 Hopkins took a prospective purchaser, Mr. and Mrs. Jack N. Holcomb of Solar Research Corporation, to see the property which is sometimes called Magnolia Hills Plantation. Hopkins testified that he gave Mr. Holcomb a legal description of the place before they left the office. This description was one Hopkins had obtained, not from Mrs. Carnegie, but from Mr. Stamos, a previous purchaser of the plantation under an escrow type contract whereby Mrs. Carnegie could — and actually did — repossess when Stamos failed to make the required payments.
On May 23, 1963, the prospective purchaser, Mr. Holcomb, informed the real estate broker that $235,000 was all he could pay and asked Hopkins if he would settle for a $5,000 commission. The following day Hopkins obtained the consent of his superiors and gave Holcomb a letter stating that he would accept a $5,000 commission on the $235,000 sale of General Tung Oil Corporation consisting of approximately 2550 acres. The delivery of this letter occurred in Hopkins’ office where Holcomb filled out an Agreement to Sell and Buy form which was executed later that day by himself and Mrs. Carnegie. This agreement dated May 24, 1963 contained no legal description but provided for the sale to Solar Research Corporation at $235,000 for the “property known as General Tung Oil Corporation located at Lamont, Florida, and consisting of approximately 2550 acres with three main residential buildings * * *. The exact details to, be made a separate agreement. * * * An escrow agreement to be executed on the corporation * * At the time of executing this agreement which had been drafted by Holcomb in Hopkins’ office outside the presence of Mrs. Carnegie, Holcomb gave her a $10,000 cashier’s check.
Norman Kapner, Mrs. Carnegie’s attorney from West Palm Beach, was then called in to prepare the papers for the transaction. Kapner deposed that when he arrived in Lamont, he was under the impression that Mrs. Carnegie was going to re *219 tain her house and the surrounding 40 ■acres but sell the corporation and all other ■property owned by it to Solar under the same escrow agreement terms employed in the Stamos deal. In a letter written by Kapner dated June 3, 1963, and sent to Mrs. Carnegie’s son, Kapner stated that when he ■arrived in Lamont, he found that Jack Hol■comb had not been appraised as to how the Stamos deal was worked, and he started balking at some of the requests; that his main objection was that he did not want to become personally liable on the $200,000 mortgage, and he finally decided he did not want to buy the General Tung Oil Corporation at all. In his letter Kapner stated that Holcomb’s primary objections as to purchasing the corporation were: previous corporate tax returns reflected a large loss, and he did not want to be put in the position of having to justify the loss to the federal gov■ernment, since the records of Stamos and Cary [previous owners] were not immediately available; and Mrs. Carnegie refused his demand that she personally guarantee ■any federal taxes he might be required to pay in the event the federal authorities refused to accept the loss. The letter further recited that after staying up most of the night, the parties finally came to the following terms:
1. Payment to be $35,000 cash and a $200,000 mortgage as previously agreed upon by the parties.
2. Purchaser to get Mrs. Carnegie’s house and the surrounding acreage but she was to receive 4% lots located outside the plantation proper and $15,000 paid in three installments for the purpose of building herself another home.
3. Purchaser to receive all real and personal property involved, but Mrs. Carnegie was to keep the corporate stock and no escrow arrangement was made.
The attorney returned to West Palm Beach and prepared the final contract which recited that the $15,000 paid in three installments was payment for the personal property included in the sale. In the final trade Holcomb paid $250,000 for 2591 acres (instead of 2550 acres) on which was located 6 tenant houses, some farm buildings and 4 residential buildings — the main house, the overseer’s house, the guest house occupied by Mrs. Carnegie, and the building called “the cottage” where the Plolcombs lived with their children during part of the time this transaction took place. Mrs. Carnegie was left with the corporation and its tax affairs.
The Holcombs testified that Mrs. Carnegie had showed them the entire plantation on their first visit and that she had mentioned no reservations except that she had at one time mentioned “cutting out some acreage which included the horses, or something like this, but had realized that this was quite foolish because she would never be able to sell the property under those conditions.” They testified that after the execution of the May 24th agreement and after Holcomb had started work on the plantation, his accountants looked into the situation and decided that under no circumstances should he purchase the corporation, but he should only purchase the real property and the farm equipment. Holcomb further testified that Mrs. Carnegie also changed her mind about the terms of their agreement and she decided she wanted either the house she was living in or she wanted an additional $15,000 to build another house plus land to put it on. Holcomb did not seek specific performance of the original agreement, but he had his attorney confer with Kapner in drafting the final agreement which was signed about July 16, 1963. Holcomb testified that Mrs. Carnegie wanted the $15,000 to be shown in the final contract as payment for personal property for income tax purposes and she desired to keep the terms of this agreement a secret from Hopkins. However, Mrs. Carnegie invited Hopkins to attend the closing. This he did and signed as a witness the final agreement which he had not read and did not inquire concerning its contents.
Hopkins was paid his $5,000, but one and one-half years later United Farm brought this action alleging that Mrs. Carnegie *220 fraudulently induced it to accept a smaller commission than that agreed upon.
The courts of this State stand ready to relieve a party from injuries suffered due to the fraudulent conduct of another, but here plaintiff United Farm Agency completely failed to prove fraud. Its own witnesses proved that it solicited and obtained an oral nonexclusive listing for the sale of a corporation; that it failed to take the precaution of getting from the owner an accurate description of the property to be sold; that it produced a prospective buyer; that the buyer refused to purchase the corporation which was never sold; that the buyer did purchase certain property included in the listing for $235,000 of which $5,000 was the broker’s fee; that the buyer further paid an additional $15,000 but he received 40 acres of land and one residence building more than was contained in the listing; that although the final agreement recited that the $15,000 was for personal property, that recital was for income tax purposes only; that all parties originally understood the final transaction to be the same type used in the Stamos deal; that there was a change in the terms of the sale; and that United’s agent, Hopkins, was invited to the closing where he had the contract laid in front of him, but he failed to examine it or make inquiry as to its content.
The plaintiff United failed to prove that the owner, Mrs. Carnegie, by entering into a sale upon terms different from those originally intended, gained any unconscionable advantage of United; made any misrepresentation upon which United relied to its detriment; or concealed a material fact while under a duty to make a disclosure.
We find that the trial judge erred in sending this cause to the jury under count III alleging fraud.
Reversed.
CARROLL, DONALD K., and JOHNSON, JJ., concur.